# In the United States Court of Federal Claims

No. 22-581
Filed: August 5, 2022
Re-issued: August 16, 2022[1]

_____

|  |  |
|---|---|
| INTEGRATED FINANCE & ACCOUNTING SOLUTIONS, LLC | ) ) ) |
| *Plaintiff*, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| *Defendant*, | ) ) |
| and | ) ) |
| ENGENIUS CONSULTING GROUP, INC., | ) ) |
| *Defendant-Intervenor*. | ) ) |

_____

*Thomas A. Coulter*, Norton Rose Fulbright, US LLP, Washington, DC, for Plaintiff.

*Evan Wisser*, Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with *Douglas K. Mickle*, *Patricia M. McCarthy*, and *Brian M. Boynton*, Department of Justice, Washington, DC, and *Susan M. Chagrin*, Defense Information Systems Agency, Office of the General Counsel, Fort Meade, Maryland.

*John D. Levin*, Maynard Cooper & Gale, P.C., Huntsville, Alabama, for Defendant-Intervenor with *W. Brad English* and *Emily J. Chancey*, *of counsel*.

## OPINION AND ORDER

**MEYERS, Judge**.

Integrated Finance & Accounting Solutions, LLC protests the award of a contract to enGenius Consulting Group, Inc. to provide various finance and budgeting support services to

---

[1] The Court initially filed this opinion under seal to allow the Parties to propose redactions. The Court has incorporated the proposed redactions and makes them with bracketed ellipses ("[ . . . ]") below.

the Department of Defense's Office of the Chief Financial Officer.  Integrated Finance had been the incumbent on two contracts that DoD combined in the challenged procurement and complains that DoD's conduct of this procurement effectively eliminated its incumbent advantage in its technical and past performance evaluations, which led to a faulty best value determination and contract award.  Because the Court finds that DoD did not do anything arbitrary and capricious in its evaluations or in making its award decision, the Plaintiff's motion for judgment on the administrative record is denied and the Government's and Intervenor's cross-motions for judgment on the administrative record are granted.

## I.     Background

### A.     Solicitation

The Defense Information Systems Agency ("DISA" or "Agency") issued Request for Quotations No. 612100003 ("RFQ") seeking quotations to support the Office of the Chief Financial Officer ("OCFO") at the Agency in "Budget/Cost/Financial Analysis, Financial Management and Technical Support Services."  ECF No. 25-1 at AR105.[2]  DISA amended the RFQ four times.  ECF No. 31 at AR279; ECF No. 25-3 at 941.[3]  The RFQ sought to "merge all of the OCFO's budget/cost/financial analysis, financial management, and technical support requirements . . . into one contract."  ECF No. 25-1 at AR15, 125.  Previously, this work was spread out across several different centers across the Agency.  *Id.* at AR125.  But after a reorganization of DISA, it decided to group all this work together under a single contract vehicle.  ECF No. 25-3 at AR939.  The RFQ was set aside for small business under a General Services Administration (GSA) Multiple Award Schedule and conducted utilizing the ordering procedures for Federal Supply Schedules ("FSS") in FAR § 8.405.[4]  The RFQ provided for a one-year base period and four one-year option periods, plus an option to extend by up to six months.  ECF No. 31 at AR279.

The Agency listed the incumbent contractor as Integrated Finance and Accounting Solutions, LLC ("IFAS").  *Id.* at AR279.

### B.     Agency's Methods of Evaluating Proposals

---

[2] The Government inadvertently omitted certain documents from the administrative record, which it subsequently filed.  *See* ECF No. 30.  As a result, the record is split between ECF Nos. 25 and 31.  The Court provides the ECF Number ahead of record cites to ease review.

[3] The amendments only address specific changes to provisions but do not include redlines to the entire RFQ.  Therefore, the Court will cite to the most recent amendment that includes the provision at issue.  For example, Amendment 4 changed the past performance evaluation criteria, so the Court cites to Amendment 4 for all arguments regarding those provisions.  Other provisions remained unchanged throughout, so the Court will refer to the initial RFQ for those provisions because that is the most recent version of the relevant language.

[4] The Federal Acquisition Regulations ("FAR") are codified in Title 48 of the Code of Federal Regulations.

The RFQ provided for award to "the schedule contractor whose quotation is determined to represent the overall best value to the Government using a best value tradeoff evaluation process." *Id.* at AR289. The RFQ stated DISA would evaluate proposals on three factors: (1) Technical/Management Approach; (2) Past Performance; and (3) Price. Technical/management approach was more important than past performance, and past performance combined with technical/management approach was more important than price. *Id.*

1.   <u>Technical/Management</u>

The technical/management factor had two subfactors: (a) technical; and (b) management. The technical subfactor was more important than the management subfactor. *Id.* ("In Factor 1: Technical/Management Approach, each Subfactor is listed in order of descending importance.").

a)   *Technical*

The technical subfactor evaluated the contractor's approach to accomplishing three subtasks under Section 6.2 of the Performance Work Statement (PWS): Subtasks 8, 9, and 10. *Id.* at AR289-90. The technical subfactor also evaluated the contractor's approach to identifying risks, and how the contractor would solve, mitigate, or reduce those risks. *Id.* Subtask 8 concerned Financial Program Support:

> The Government will evaluate the schedule contractor's approach to ensuring the monthly server, storage and mainframe rate-based billing and bi-monthly mainframe rate-based billing is processed 95% of the time through the inventory asset management system and mainframe inventory control system appropriately and IAW DoD 7000.14-R financial management business rules and policies. The Government will consider whether the schedule contractor's approach will meet or exceed the requirements in Activity 1 and Activity 2 of PWS 6.2.8.

*Id.*

> Subtask 9 concerned the Business System Support:

> The Government will evaluate the schedule contractor's approach to provide the technical knowledge and support necessary to maintain and administer complex financial coding structures within Defense Working Capital Funds (DWCF) business systems for inventory management systems, mainframe inventory control systems, proposal pricing systems (PPSs), and DWCF budgeting systems. The Government will consider whether the schedule contractor's approach will meet or exceed the requirements in PWS 6.2.9 Activity 1.

*Id.* at AR289-90.

b)   *Management*

3

The management subfactor required the quoters to demonstrate their approach to staffing and training, and place of performance management. *Id.* at AR290-91. DISA would evaluate the staffing and training approach on: (1) whether the quoter's approach provided fully trained and qualified personnel; (2) the quoter's plan to fill vacant positions and prevent lapses in key personnel; and (3) whether the quoter's approach provided a competent staff that could satisfy the PWS. *Id.* at AR290. The RFQ also required the quoters to include their approach to managing geographically disparate places of performance, relationship between onsite workers and corporate, and how it would manage subcontractors. *Id.* at AR291. DISA would evaluate the effectiveness of the proposed management approach, which considered the "ability to meet or exceed the stated minimum solicitation requirement, and provide[] a sufficient level of oversight . . . ." *Id.* "Sufficient," in this context, meant the quoter demonstrated the ability to meet the needs of the Government in the PWS. *Id.* at AR291.

DISA assigned each of the technical subfactors a color which corresponded to a specific rating. *Id.* at AR289. These ratings were:

| Table 2: Color Scheme for the Combined Technical / Management and Risk Ratings | | |
|---|---|---|
| **Color** | **Rating** | **Description** |
| **Blue** | Outstanding | Quotation indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| **Purple** | Good | Quotation indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| **Green** | Acceptable | Quotation meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| **Yellow** | Marginal | Quotation has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| **Red** | Unacceptable | Quotation does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Quotation is unawardable. |

ECF No. 25-1 at AR186.

### 2. Past Performance

The RFQ allowed quoters to submit "no more than 3" past performance efforts for consideration. To qualify, some portion of each must have been performed within the last three years prior to the submission deadline, and any current effort must have at least six months of performance completed. *Id.* at AR291. DISA's evaluation resulted in two ratings for each prior effort. First, DISA rated the relevance of the effort. Then, DISA rated the performance quality of each effort. Based on these two ratings, DISA gave each quoter an overall confidence rating.

### a) *Relevance of past performance.*

DISA determined each past performance effort's relevance according to the following criteria:

| Table 4: Past Performance Relevancy Ratings | |
|---|---|
| Rating | Definition |
| VERY RELEVANT | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| RELEVANT | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| SOMEWHAT RELEVANT | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| NOT RELEVANT | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

ECF No. 25-1 at AR187.  Past performance efforts with a higher relevance rating "*may* be afforded greater weight than those with lower relevance."  *Id.* at AR292 (emphasis added).

> b)  *Quality of past performance.*

After determining the relevance of a schedule contractor's past performance, DISA then evaluated the quality of that past performance according to the criteria below:

| Table 5. Past Performance Quality Ratings | |
|---|---|
| Quality Assessment Rating | Description |
| EXCEPTIONAL (E) | During the contract period, contractor performance meets or met contractual requirements and exceeds or exceeded many to the Government's benefit. The contractual performance of the element or sub-element being assessed was accomplished with few minor problems for which corrective actions taken by the contractor were highly effective. |
| VERY GOOD (VG) | During the contract period, contractor performance meets or met contractual requirements and exceeds or exceeded some to the Government's benefit. The contractual performance of the element or sub-element being assessed was accomplished with some minor problems for which corrective actions taken by the contractor were effective. |
| SATISFACTORY (S) | During the contract period, contractor performance meets or met contractual requirements. The contractual performance of the element or sub-element being assessed contained some minor problems for which corrective actions taken by the contractor appear or were satisfactory. |
| MARGINAL (M) | During the contract period, contractor performance does not or did not meet some contractual requirements. The contractual performance of the element or sub-element being assessed reflects a serious problem for which the contractor has not yet identified corrective actions. The contractor's proposed actions appear only marginally effective or were not fully implemented. |

| UNSATISFACTORY(U) | During the contract period, contractor performance does not or did not meet most contractual requirements and recovery in a timely manner is not likely. The contractual performance of the element or sub-element contains serious problem(s) for which the contractor's corrective actions appear or were ineffective. |
| NOT APPLICABLE (N) | Unable to provide a rating. Contract did not include performance for this aspect. Do not know. |

ECF No. 25-1 at AR187.

          *c)*   *Performance confidence assessment.*

Based on the relevance and quality ratings, DISA made an overall "Performance Confidence Assessment." *Id.* at AR118. DISA performed this assessment according to the following criteria:

| TABLE 6: Performance Confidence Assessments | |
|---|---|
| **Rating** | **Description** |
| SUBSTANTIAL CONFIDENCE | Based on the Schedule Contractor's recent/relevant performance record, the Government has a high expectation that the Schedule Contractor will successfully perform the required effort. |
| SATISFACTORY CONFIDENCE | Based on the Schedule Contractor's recent/relevant performance record, the Government has a reasonable expectation that the Schedule Contractor will successfully perform the required effort. |
| NEUTRAL CONFIDENCE | No recent/relevant performance record is available or the Schedule Contractor's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. |
| LIMITED CONFIDENCE | Based on the Schedule Contractor's recent/relevant performance record, the Government has a low expectation that the Schedule Contractor will successfully perform the required effort. |
| NO CONFIDENCE | Based on the Schedule Contractor's recent/relevant performance record, the Government has no expectation that the Schedule Contractor will be able to successfully perform the required effort. |

*Id.* at AR188.

        3.   <u>Price</u>

DISA evaluated each quote's price for reasonableness and completeness. ECF No. 31 at AR293. DISA used FAR § 15.404's cost and price analysis techniques to determine whether the price was reasonable. ECF No. 25-1 at AR118. The completeness requirement ensured the quote correctly calculating figures and presented prices in a clear and useful format. ECF No. 31 at AR293.

    **C.**    **Submission and Evaluation of Proposals**

DISA received seven quotes in response to the RFQ.  ECF No. 25-3 at AR941.  Four of these were ineligible; one because the price proposal was incomplete, and three because they received a red/unacceptable rating in the technical subfactor.  *Id.* at AR942, 969.  The Technical Evaluation Board ("TEB") rated the remaining quotes as follows:

| | Technical/Management Approach | | Past Performance Eval | Price Eval | | |
|---|---|---|---|---|---|---|
| Offeror | Subfactor 1 Rating | Subfactor 2 Rating | Confidence | Total Eval Price | % Difference to IGCE | Proposal Complete |
| enGenius | Green/Acceptable | Green/Acceptable | Neutral | $32,519,780.08 | -4% | Yes |
| EBI | Purple/Good | Yellow/Marginal | Neutral | $34,972,372.28 | 3% | Yes |
| IFAS | Green/Acceptable | Green/Acceptable | Satisfactory | $36,138,287.36 | 7% | Yes |

*Id.* at AR969.

      1.    IFAS's Evaluation

      a)    *Technical/Management*

The TEB found IFAS's quote for both the technical and management subfactors demonstrated an "adequate approach and understanding of the requirements" with the risk of unsuccessful performance being no less than moderate.  *Id.* at AR951.

DISA assessed IFAS's technical proposal as acceptable with zero strengths, one weakness, zero significant weaknesses, zero deficiencies, and zero uncertainties.  *Id.* at AR951, 972.  The weakness was due to IFAS's approach to PWS Section 6.2.9.1.c Subtask 9, which did not demonstrate how IFAS would ensure its business systems were administered in accordance with DoD 7000.14-R Vol. 10 DWCF.  *Id.*

DISA also found IFAS's management proposal to be acceptable with zero strengths, zero weaknesses, zero significant weaknesses, zero deficiencies, and zero uncertainties.  *Id.* at AR952, 972.

      b)    *Past performance*

IFAS submitted three recent references for evaluation.  *Id.* at AR958.  The Past Performance Evaluation Board ("PPEB") rated IFAS's past performance as follows:

| Confidence | Reference | Recency | Relevance | Quality |
|---|---|---|---|---|
| | 1 | Yes | Relevant | Satisfactory |
| Satisfactory | 2 | Yes | Relevant | Very Good |
| | 3 | Yes | Relevant | Very Good |

*Id.* at AR954.  The basis for these ratings is as follows.

(1)     Evaluation of IFAS's first reference

The PPEB determined that the first reference corresponded to 85% of the work under PWS Tasks 6.1 and 6.2. *Id.* at AR958. The PPEB also recognized that the annual value for the first reference was $3,002,048.42, which was less than the range the PWS said would be more relevant. ECF No. 31 at AR292; ECF No. 25-3 at AR959. The PPEB reviewed the Contractor Performance Assessment Reporting System ("CPARS") evaluation and rated the performance quality as Satisfactory. ECF No. 25-3 at AR960.

(2)     Evaluation of IFAS's second reference

The PPEB determined that the second reference was "similar scope and magnitude" and corresponded to 79% of the work that was required by PWS Task 6.2. *Id.* at AR959. The annual value for the second reference was $2,787,752.35, which was also below the $4 million threshold in the PWS. ECF No. 31 at AR292; ECF No. 25-3 at AR959. The PPEB also reviewed the CPARS for this reference and determined that IFAS exceeded the PWS requirements in quality, schedule, management, and regulatory compliance, to the benefit of the Government." ECF No. 25-3 at AR960. This earned IFAS a "Very Good" quality rating for the second reference. *Id.* at AR958.

(3)     Evaluation of IFAS's third reference

Finally, the PPEB determined that the third reference was "similar scope and magnitude" of the PWS and corresponded to 79% of the work that was required by PWS Task 6.2. *Id.* at AR959. The annual value for the third reference was $2,787,752.35, which was again below the $4 million threshold in the PWS for a past performance to be more relevant. *Id.* at AR959-60. IFAS earned a "Very Good" on the quality assessment because, like the second reference, IFAS exceeded the PWS requirements in quality, schedule, management, and regulatory compliance to the benefit of the Government. *Id.* at AR958, 960.

c)     *Price*

IFAS's evaluated price of $36,138,287.36 was 7% higher than the Independent Government Cost Estimate ("IGCE"). *Id.* at AR968.

2.     enGenius's Evaluation

a)     *Technical/Management*

The TEB found that enGenius's quote for both the technical and management subfactors demonstrated an "adequate approach and understanding of the requirements" with the risk of unsuccessful performance being no less than moderate. *Id.* at AR952-53.

DISA rated enGenius's technical proposal Acceptable with zero strengths, zero weaknesses, zero significant weaknesses, zero deficiencies, and one uncertainty. *Id.* at AR952, 972. The uncertainty was due to enGenius "mistakenly including a diagram supporting Server and Storage Billing through ITSM when discussing in its narrative Enterprise Service billing." *Id.* at AR952.

DISA rated enGenius's management proposal as Acceptable with zero strengths, two weaknesses, zero significant weaknesses, zero deficiencies, and zero uncertainties. *Id.* at AR951, 972. The first weakness was for "not adequately describing the relationship between the corporate administration and onsite administration." *Id.* at AR953. And the second weakness was due to enGenius "not explicitly stating that it will use its Place of Performance Management approach in the case of a contingency environment or while its employees are working from home." *Id.*

### b) *Past performance*

enGenius submitted three references, all of which had been performed within the past three years as required by the RFQ. *Id.* at AR962. The PPEB rated enGenius's past performance as follows:

| Confidence | Reference | Recency | Relevance | Quality |
|---|---|---|---|---|
| Neutral | 1 | Yes | Somewhat Relevant | Very Good |
| | 2 | Yes | Somewhat Relevant | Very Good |
| | 3 | Yes | Somewhat Relevant | Exceptional |

*Id.* at AR954. The basis for these ratings is below.

### (1) Evaluation of enGenius's first reference

DISA found that enGenius's first reference correlated to some work under PWS Tasks 6.1 and 6.2. *Id.* at AR962. Although the PPEB concluded that enGenius provided "scare information" as it relates to Task 6.1, the PPEB rated enGenius's first reference Somewhat Relevant because it involved "some of the scope and complexities this solicitation requires . . . ." *Id.* As for enGenius's quality of performance, the PPEB reviewed a CPARS which described IFAS's performance on the first reference as "exemplary" and how IFAS was able to provide an overall benefit to the Government despite the impact of the COVID-19 pandemic. *Id.* at AR963. The CPARS review also stated enGenius was highly effective in communicating with the government which resulted in "increased government efficiency and responsiveness to every changing environment." *Id.* Finally, the review indicated that enGenius operated as a "seamless, one-badge entity and does a very good job of managing its subcontractors and integrating the workforce into a single, effective unit." *Id.* Thus, the PPEB assigned a Very Good rating for enGenius's performance quality of the first reference. *Id.* at AR961.

### (2) Evaluation of enGenius's second reference

The PPEB recognized that the magnitude of enGenius's second reference was less than $4M-$6M per year. *Id.* at AR962. Nevertheless, enGenius performed work in the General Fund and Defense Working Capital Fund which correlated to some of the PWS tasks. Thus, DISA assessed a Somewhat Relevant rating for the second reference. *Id.* As for quality, the PPEB determined that "'although there are few comments made for each rating element in addition to

the rating chosen.  Based on the above information with no other issues being identified, leads the reviewed to accept this PPW's overall rating of Excellent.'" *Id.* at AR963.  This resulted in the PPEB rating enGenius's second reference as Very Good.

(3)   Evaluation of enGenius's third reference

Finally, the PPEB assigned a Somewhat Relevant rating to enGenius's third reference despite enGenius providing "scarce information in requirements for PWS Task 6.2." *Id.* at AR961-62.  The PPEB justified this rating because "the requirements for this effort include both Task 6.1 and Task 6.2 in meeting OCFO mission sets . . . ." *Id.* at AR963.  The PPEB reviewed a CPARS evaluation that lauded the performance of Koniag, a subcontractor enGenius proposed to use in its quote, describing its performance as "Exceptional." *Id.* at AR963-64.  Koniag had exceeded the contractual requirements to the Government's benefit in the quality, schedule, and management elements. *Id.*  The PPEB, therefore, found the performance quality to be Exceptional.

*c)    Price*

Like IFAS, enGenius submitted a completed price quote that complied with the solicitation. *Id.* at AR967.  enGenius's total evaluated price of $32,519,780.08 was 4% less than the IGCE. *Id.* at AR967-68.

3.   <u>Comparison of IFAS and enGenius proposals and Contracting Officer's decision.</u>

During its tradeoff analysis, DISA began by comparing enGenius to EBI, which submitted the next higher priced acceptable quote. *Id.* at AR970.  DISA found that EBI's technical subfactor proposal was better than enGenius's, but that its management subfactor was marginal and "had a high risk of unsuccessful performance." *Id.* at AR971.  In the end, DISA concluded that EBI's better technical subfactor proposal was not worth the extra management risk and cost as compared to enGenius's proposal and eliminated EBI from consideration.

DISA then turned to compare enGenius's and IFAS's proposals.  In this tradeoff analysis, DISA found that both IFAS and enGenius met the RFQ requirements, both provided adequate approaches and understandings to those requirements, and the risk of unsuccessful contract performance was no worse than moderate for both. *Id.* at AR973.  Under the RFQ, however, the Technical subfactor was more important than the Management subfactor.  While neither enGenius nor IFAS had any strengths in the combined Technical/Management approach, IFAS did receive a weakness in the most important subfactor (Technical).  According to DISA, "the fact that enGenius had no flaws in its Subfactor 1 (Technical) approach is more important than the fact that IFAS provided no flaws in its management approach." *Id.*

DISA determined that past performance was a "distinguishing factor" between IFAS's and enGenius's proposals. *Id.*  To recap, IFAS received a Satisfactory confidence rating meaning there was a "reasonable expectation that the Schedule Contractor will successfully perform the required effort."  ECF No. 25-3 at AR973; ECF No. 25-1 at AR188.  enGenius received a Neutral confidence rating, meaning either there was "[n]o recent/relevant performance record [was] available" or that the "Schedule Contractor's performance record is so sparse that

10

no meaningful confidence assessment rating can be reasonably assigned."  ECF No. 25-1 at AR188; ECF No. 25-3 at AR973.  Despite the higher confidence rating, the contracting officer concluded that "[t]he benefit realized by the Government in having a company with a higher confidence rating is not worth a price premium of $3,618,507.28."  ECF No. 25-3 at AR973.  Further, the Agency noted that there were no other characteristics of IFAS's proposal that warranted paying the 11% price premium.  *Id.*  Thus, the Agency concluded that enGenius's quote was the best value to the Government.  *Id.*

### D.  Protest at GAO

Plaintiff filed a protest at GAO raising five arguments.  First, that DISA "failed to properly rate IFAS's past performance."  ECF No. 25-5 at AR1320-25.  Second, that DISA evaluated IFAS's quote improperly in its determinations of strengths and weaknesses while failing to rigorously examine enGenius's quote.  *Id.* at AR1326-30.  Third, that DISA failed to adequately document its best-value tradeoff analysis and improperly employed a lowest-price technically acceptable evaluation that overweighed price.  *Id.* at AR1330-33.  Fourth, that the errors in DISA's assessments of IFAS and enGenius's proposals, and DISA's failure to compare the two quotes to each other, resulted in a flawed best-value determination.  *Id.* at AR1333-34.  And fifth, that DISA improperly failed to conduct a price realism analysis given enGenius's quoted price and lack of relevant past performance.  *Id.* at AR1334-35.  GAO denied IFAS's protest.  ECF No. 25-6 at 2455-64.

## II.  Jurisdiction and Standard of Review

### A.  Jurisdiction

The Tucker Act provides this Court with jurisdiction over post-award challenges to contract awards brought by an interested party.  *Vectrus Sys. Corp. v. United States*, 154 Fed. Cl. 29, 40 (2021) (citing *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012)).  To qualify as an "interested party" a protestor must be an actual or prospective bidder who has a direct economic interest in the procurement.  *Id.* (citations omitted).  Actual or prospective bidders have a direct economic interest in the procurement if they "suffered a competitive injury or prejudice as a result of an alleged error in the procurement process."  *Id.* (citations omitted).  Competitive injury or prejudice can be shown by demonstrating that the plaintiff "would have had a 'substantial chance' of winning the award 'but for the alleged error in the procurement process.'"  *Id.* (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009)).

### B.  Standard of Review

This Court reviews post-award bid protests in accordance with the standards set forth in the Administrative Procedures Act ("APA"), 5 U.S.C. § 706.  *See* 28 U.S.C. § 1491(b)(4).  It is clear that "the Court should not substitute its judgment to assess the relative merits of competing proposals in a Government procurement."  *Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253, 260 (2015) (citations omitted).  Rather, "the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."  *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d

901, 907 (Fed. Cir. 2013).  Thus, "a bid award may be set aside if (1) the procurement official's decision lacked a rational basis or (2) the procurement procedure involved a violation of regulation or procedure." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) (citations and alterations omitted) (quoting *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020)).

This Court's review in bid protests under the arbitrary and capricious standard is "highly deferential." *DynCorp Int'l*, 10 F.4th at 1315 (quoting *Glenn Def.*, 720 F.3d at 907).  Because of this high deference, an "explicit explanation is not necessary . . . where the agency's decisional path is reasonably discernable." *Id.* (quoting *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998)).  And the Court will "'sustain an agency action evincing rational reasoning and consideration of relevant factors.'" *Id.* (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)).  This being the standard, Plaintiff "'bears a heavy burden of showing that the award decision had no rational basis.'" *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)).  Plaintiff's burden increases when greater discretion is afforded to the contracting officer. *E.g.*, *Glenn Def.*, 720 F.3d at 907-08 ("'[T]he greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious.'") (quoting *Burroughs, Corp. v. United States*, 223 Ct. Cl. 53, 64 (1980)).

## III.    Discussion

### A.    IFAS's challenges to DISA's evaluation of its quote.

#### 1.    Past performance rating.

IFAS challenges DISA's relevancy evaluation of its past performance, claiming that it was error for the Agency to rate IFAS's first two past performance projects,[5] which are predecessor contracts to the RFQ, as "Relevant" rather than "Very Relevant."  ECF No. 28-1 at 14-18.  According to the RFQ, "[s]imilar scope efforts should demonstrate as many of the task area types included in the PWS (*either individually or in combination thereof*) as possible."  ECF No. 31 at AR292 (emphasis added).  IFAS contends that "the Agency failed to consider that 'in combination thereof,' IFAS covered almost every single task area between its two contracts."  ECF No. 28-1 at 15 (citing ECF No. 31 at AR292).  These two contracts, according to IFAS, account for 89.9% of the total work under the current solicitation.  *Id.* at 14.  And if they were combined, IFAS says a higher relevancy rating would have been assigned which would have increased their confidence rating in the second factor from "Satisfactory Confidence" to "Substantial Confidence."  *Id.* at 14-15.  The Government disagrees and contends that the "in combination thereof" simply states that past performance efforts under a contract need not match up one-to-one with PWS tasks.  In other words, one element of prior work may relate to multiple PWS tasks and vice versa (multiple prior work elements could relate to one PWS task).  ECF No.

---

[5] Although IFAS submitted three past performance references, this protest challenges only DISA's evaluation of the first two—the predecessor contracts.  References to "both" contracts are to IFAS's past performance references one and two.

35 at 4. And the Government insists that the sentence including "in combination thereof" "has nothing to do with combining multiple past performance references." *Id.*

An agency's evaluation of an offeror's past performance is "'entitled to great deference.'" *Id.* (quoting *Al Andalus Gen. Contracts Co. v. United States*, 86 Fed. Cl. 252, 264 (2009)). There is good reason for such deference because "it is the agency that must bear the burden of any difficulties resulting from a defective evaluation" nor will a court "substitute [its] judgment for a reasonably based past performance rating." *DynCorp Int'l*, 139 Fed. Cl. at 489-90.

While the RFQ is not a model of clarity on this issue, the Government's reading better comports with the RFQ's text than IFAS's. The Court begins with the provision that IFAS relies upon to argue that DISA could and should have combined its two prior contracts during the past performance evaluation. In its entirety, the provision states:

> Similar scope contracts may include efforts in a variety of sizes, a variety of disciplines, and varying degrees of technical complexity. Similar scope efforts should demonstrate as many of the task area types included in the PWS (either individually or in combination thereof) as possible.

ECF No. 31 at AR292. While the parties focus their arguments on the second sentence, the Court cannot interpret it without reference to the first sentence. This is because the first sentence provides a key piece of information about "efforts"—they are "include[d]" within "contracts."[6] This makes interpreting the second sentence rather easy. It does not say that "contracts" should demonstrate PWS tasks either individually or in combination, it says that "efforts" should do so. Thus, when it talks about combining "efforts" to demonstrate as many PWS tasks as possible, the RFQ is not stating that DISA would consider multiple contracts together. Rather, the RFQ says DISA will combine various work efforts (what the Government terms "elements" in its briefing) within a contract, if necessary, to demonstrate relevance to specific PWS tasks.

This reading is bolstered by the RFQ's provisions regarding the added relevance of certain contracts: "Contracts/Orders that provided multiple types of similar scope support for durations of multiple years will be more relevant." ECF No. 31 at AR292. Among the contracts that may receive increased relevance were:

> Contracts/orders with a total value inclusive of the base period and all options in excess of $20M or with an average annual value (per 12 month period of performance) of $4M-$6M. Either: (1) a single contract/order or (2) multiple orders on the same IDIQ or BPA may

---

[6] There are other provisions that use the term "effort" in a manner that is arguably inconsistent with the Court's reading, *e.g.*, the next provision that states that "efforts" include "contracts/orders." ECF No. 31 at AR292. To the extent this usage creates an ambiguity, it is patent and IFAS cannot challenge it now. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

> be combined to reach the total $20M contract value or annual $4M-
> $6M value.

*Id.* By its plain terms, the RFQ provided that the only time DISA would combine *contracts* for added relevance was when they were multiple orders on the same IDIQ or BPA contract.

With this understanding of the RFQ, IFAS's arguments fail. IFAS argues that DISA should have combined its predecessor contracts for review, which would have found them more relevant. ECF No. 28-1 at 15-17. But it is undisputed that neither of IFAS's predecessor contracts meet the $20M total or $4M-$6M annual value thresholds. That meant the RFQ prohibited combination of the contracts for relevance purposes. Because this limitation was clear on the face of the RFQ, IFAS cannot challenge it now. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

This prohibition also readily distinguishes this case from *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560 (2000), the primary case upon which IFAS rests its argument. In *Seattle Security*, the plaintiff served as the incumbent contractor on two contracts to provide security to federal buildings in Washington and Oregon, which were consolidated into the contract at issue in that case. *Id.* at 562. There, Judge Allegra relied on the fact that nothing in the RFP prevented the agency from combining the two predecessor contracts for review. *Id.* at 568. This RFQ does prohibit such combination. Also, the contracting officer in *Seattle Security* did not evaluate one of the predecessor contracts at all, which prejudiced the plaintiff under the evaluation regime in that case. *Id.* at 567-68. Here, DISA evaluated both of IFAS's contracts. ECF No. 25-3 at AR958-59. For these reasons, *Seattle Security* does not help IFAS.

IFAS insists that its performance of 89.9% of the PWS tasks across the two predecessor contracts required DISA to rate them both as Very Relevant rather than Relevant. ECF No. 28-1 at 15-16. Even if the RFQ did not prohibit combination of contracts in this way, it is not at all clear that IFAS is right that DISA must have rated the contracts Very Relevant. DISA found that IFAS's two prior contracts showed work corresponding to 85% and 79%, respectively, of the PWS tasks. ECF No. 25-3 at AR958-59. Recall that the definition of "Very Relevant" is that the "[p]resent/past performance effort involved *essentially the same* scope and magnitude of effort and complexities this solicitation requires." ECF No. 25-1 at AR187 (emphasis added). Recall too that the RFQ defined "Relevant" as "[p]resent/past performance effort involved *similar* scope and magnitude of effort and complexities this solicitation requires." *Id.* (emphasis added). For IFAS to prevail, the Court would have to determine that the line between "essentially the same" and "similar" necessarily lies somewhere between 85% and 89.9% because IFAS does not contend that the contract corresponding to 85% of the work should have been Very Relevant standing alone. But there is nothing in the RFQ that makes any such line clear. It could certainly be rational for DISA to consider "essentially the same" to mean something more than an 89.9% correlation of tasks (assuming IFAS's 89.9% is correct).

Finally, IFAS contends that the RFQ required DISA to find the predecessor contracts more relevant because they are contracts to provide budgeting and cost estimating support to the Government. ECF No. 34 at 6. The RFQ provides that "Contracts/orders providing budgeting or cost estimating support to DoD or non-DoD entities, including other Federal Agencies" will be more relevant. ECF No 31 at AR292. But the RFQ does not specify how the added relevance

will be credited, leaving it to agency discretion.  *Cf. SP Sys., Inc. v. United States*, 86 Fed. Cl. 1, 23 (2009) ("[P]ast performance evaluation 'will not be disturbed unless it is unreasonable or inconsistent with the terms of the solicitation or applicable statutes or regulations.'") (quoting *Consol. Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 637 (2005)).  Here, DISA recognized that each contract was a predecessor contract, ECF No. 25-3 at AR679, AR683, and corresponded to many of the budgeting and cost estimating PWS tasks, ECF No. 25-3 at AR958-59.  Having recognized the commonality of work, DISA complied with the RFQ and provided the weight it found appropriate.  DISA's evaluation was within the broad agency discretion in performing the past performance evaluation and won't be disturbed.

Given that DISA complied with the RFQ's terms, its evaluation was not arbitrary or capricious.  *See Distrib. Sols., Inc. v. United States*, 106 Fed. Cl. 1, 20 (2012), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013) (citing *Bannum, Inc. v. United States*, 91 Fed. Cl. 2013).160, 173 (2009) ("An agency does not act unreasonably when it sets forth specific past performance evaluation criteria and then applies those criteria.")).  The Government further argues that even if DISA increased the relevancy rating of IFAS's predecessor contracts in this case, it could not change the confidence rating and, therefore, the relevancy ratings could not prejudice IFAS. ECF No. 33 at 20-21.  Because the Court finds no error in the past performance evaluation, it need not reach the question of prejudice for this evaluation.

2.  <u>Technical rating.</u>

a)  *Weakness*

IFAS next challenges DISA's finding of a weakness in its technical rating for failing to explain how it would ensure compliance with DoD 7000.14-R Vol. 10 DWCF policies and procedures regarding Subtask 9.  The RFQ defines a "weakness" as "[a] flaw in the quotation that increases the risk of unsuccessful contract performance."  ECF No. 25-1 at AR186.  The RFQ required offerors to "demonstrate an approach to fully meet or exceed" Subtasks 8, 9, and 10.  ECF No. 31 at AR266.  Subtask 8 involved financial program support and required the offerors to ensure business systems were administered in accordance with DoD 7000.14-R Vol. 10 DWCF policies and procedures.  ECF No. 25-1 at AR22.  Accordingly, the RFQ required the offerors to demonstrate how they would comply with this task.  *Id.*  Similarly, Subtask 9 involved providing technical knowledge and support to maintain and administer complex coding within business systems and required the offerors to have a "working knowledge" of DoD 7000.14-R Vol. 10 DWCF policies and procedures.  *Id.* at AR23-24.

DISA assessed IFAS a weakness because it "d[id] not demonstrate how it will ensure business systems are administered IAW DoD 7000.14."  ECF No. 28-1 at 19.  IFAS disagrees. IFAS claims that it *did* provide "numerous statements indicating its efforts to ensure business systems remain compliant with that DOD requirement."  *Id.*  It is not disputed that IFAS demonstrated how it would ensure compliance with these regulations when performing Subtask 8, which DISA recognized in its evaluation of Subtask 8.  But the weakness relates to IFAS's approach to Subtask 9 rather than Subtask 8.  And a review of IFAS's quote reveals that it omitted any reference to DoD 7000.14-R Vol. 10 DWCF policies and procedures in its approach to Subtask 9.  ECF No. 25-5 at AR1489.

IFAS all but acknowledges this failure, arguing that the distinction between Subtasks 8 and 9 "elevates form over substance – IFAS clearly demonstrated that it was fully aware of the regulation and how to meet it and noted that in its proposal several times, but the fact that it did not simply refer to the same awareness in a different section of its proposal does not justify a weakness." ECF No. 34 at 9. But this argument simply asks the Agency to infer that IFAS's plan to ensure compliance with DoD 7000.14 in Subtask 8 also applies to Subtask 9. Or DISA could simply assume that, because IFAS knew these policies and procedures as the incumbent contractor, DISA could overlook IFAS's not mentioning them regarding Subtask 9. This is something an agency cannot do. It is axiomatic that "[o]fferors carry the burden of presenting 'an adequately written proposal, and an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably.'" *Software Eng'g Servs., Corp. v. United States*, 85 Fed. Cl. 547, 554 (2009) (quoting *United Enter. & Assocs. v. United States*, 70 Fed. Cl. 1, 26 (2006)). And the agency "could not have acted arbitrarily or capriciously by judging IFAS on the actual text of its proposal." ECF No. 33 at 16 (citing *Asset Prot. & Sec. Servs., L.P. v. United States*, 5 F.4th 1361, 1366 (Fed. Cir. 2021)).

Finally, IFAS argues that the omission of how it would approach Subtask 9 (and its compliance with DoD 7000.14) could have easily been cured by the Agency through discussions. ECF No. 28-1 at 21. It is beyond dispute that DISA could have engaged in discussions with IFAS. Indeed, DISA reserved "the right to conduct exchanges or seek clarifications if the Contracting Officer (KO) determines they are necessary." ECF No. 31 at AR294. That is not the question. The question is whether it was arbitrary and capricious for DISA not to seek clarification from, or hold discussions with, IFAS. It was not.

First, it is true that DISA reserved the right to have exchanges if the contracting officer found them necessary. ECF No. 31 at AR294. But the RFQ could not have been clearer: "The Government intends to evaluate quotations and award a contract *without exchanges with schedule contractors*." *Id.* at AR271 (emphasis added). When the RFQ states that the agency intends to award a contract without exchanges, a protestor cannot complain about a lack of exchanges. *See Software Eng'g Servs.*, 85 Fed. Cl. at 555 ("'[I]t is well established that all offerors, including incumbents, are expected to demonstrate their capabilities in their proposals.'") (quoting *Int'l Res. Recovery, Inc. v. United States*, 60 Fed. Cl. 1, 6 (2004)).

Second, IFAS claims that DISA was already aware that IFAS was ensuring compliance with DoD 7000.14 given its role as the incumbent. According to IFAS, the failure to seek clarification of IFAS's quote when DISA was aware IFAS was performing these tasks on the predecessor contracts, was arbitrary and capricious. ECF No. 28-1 at 21. To the extent IFAS seeks to apply something akin to the too close at hand doctrine to its technical evaluation, the Court declines to do so. Under the too close at hand doctrine, there is certain information about past performance that if the agency is aware of, it cannot ignore. *Seattle Sec. Servs.*, 45 Fed. Cl. at 568. IFAS did not cite any case in which this Court or the GAO has applied the too close at hand doctrine to a technical evaluation, and the Court has not found one. The Court declines to expand the doctrine here to technical evaluations.

Third, this argument rests on IFAS's contention that DISA conducted this procurement as a negotiated procurement under FAR Part 15. *Id.* And "where the record establishes that the

agency treated the quoters' responses as if it was conducting a negotiated procurement, the Court will analyze the protester's arguments under the standards applicable to negotiated procurements." *Id.* at 21 n.4 (citing *Centerra Grp., LLC v. United States*, 138 Fed. Cl. 407, 415 (2018)). But DISA did not conduct this procurement under FAR Part 15; DISA conducted this procurement under FAR Subpart 8.4. ECF No. 31 at AR279. The RFQ explicitly stated that this procurement was to be conducted pursuant to FAR Subpart 8.4 provisions, which do not require exchanges with quoters. *Id.* The terms of the procurement, and the provisions of FAR Subpart 8.4, preclude any claim for the Agency's failure to engage in discussions or conduct exchanges. *IBM Corp. v. United States*, 119 Fed. Cl. 145, 158-59 (2014) (finding no fault for the agency's failure to engage in exchanges with an offeror in a FAR Subpart 8.4 procurement); *Distrib. Sols., Inc.*, 106 Fed. Cl. at 15 (rejecting argument that agency was compelled to provide plaintiff an opportunity to respond to its past performance evaluations because the procurement was conducted under FAR Part 8).

The one case IFAS cites in support of this argument, *Centerra Group*, is inapplicable. There, the agency chose to conduct exchanges with only one of the offerors, the awardee, and allowed it (and only it) to amend its proposal to avoid the problems raised in the protest. *Centerra Grp.*, 138 Fed. Cl. at 415. The Court concluded that in those circumstances "looking to FAR Part 15 when reviewing the fairness of discussions held in FAR Subpart 8.4 procurements . . . at least for the relevant definitions of clarifications and discussions, is the only sensible approach." *Id.* There is no such unfairness here.

And *Centerra* only imputed the fairness principles of FAR Part 15, it did not import Part 15 requirements into a FAR Subpart 8.4 procurement. *Id.* The Court was clear that it "refus[ed] to shoehorn FAR Subpart 8.4 procurements into the procedures outlined in FAR Part 15." *Id.* Thus, *Centerra* does not undermine the general rule in this Court that a "procurement[] conducted under [FAR] Subpart 8.4 [is] different from those conducted under [FAR] Part 15, even if 'some procedures also present in Part 15 are utilized.'" *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 44 (2010), *aff'd*, 649 F.3d 1320 (Fed. Cir. 2011) (quoting *Sys. Plus, Inc. v. United States*, 68 Fed. Cl. 206, 211 (2005)). Because nothing here approaches the unfairness in *Centerra Group*, this Court also refuses to apply FAR Part 15 requirements in this FAR Part 8 procurement. *E.g.*, *IBM Corp.*, 119 Fed. Cl. at 158; *Matt Martin Real Est. Mgmt., LLC v. United States*, 96 Fed. Cl. 106, 116-17 (2010).

In the end, IFAS has only itself to blame for not including all the relevant information in its quote to the Agency.

### b)      Strengths

IFAS contends that DISA failed to assign any strengths to its technical proposal, which depressed its Technical/Management rating to Green/Acceptable. ECF No. 28-1 at 22-23; ECF No. 25-3 at AR950. IFAS argues that its proposal had multiple strengths and a proper evaluation would have resulted in a higher Technical/Management rating. ECF No. 28-1 at 22. The Government rejects this argument as nothing more than a disagreement with the Agency's evaluation, which falls short of establishing that the evaluation was arbitrary or capricious. ECF No. 33 at 17.

The RFQ defines a "Strength" as "[a]n aspect of an [sic] quotation that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during Contract performance." ECF No. 25-1 at AR186. Before the GAO, IFAS provided a chart with examples that purportedly demonstrated that its quote had "many strengths." ECF No. 28-1 at 22-23 (citing ECF No. 25-5 at AR1328-29). Yet these examples merely show how IFAS is performing the tasks in the predecessor contracts. What is missing is an explanation of how these aspects of IFAS's proposal "exceed[] specified performance or capability requirements," nor does IFAS explain how such performance is "advantageous to the Government." ECF No. 25-1 at AR186; ECF No. 25-5 at AR1328-29.

The first strength IFAS claims it should have received relates to the RFQ's requirement that quoters "provide billing support for server, storage, mainframe, and enterprise service offerings supporting DISA's DWCF." ECF No. 28-1 at 22 (quoting ECF No. 25-5 at AR1374). IFAS argues it should have gotten a strength because its proposal stated that it "'managed the support and billing for approximately 884 servers, accounting for 1M gigabytes of data per month for the U.S. Department of Transportation's OCIO/WCF,' a clear strength that exceeds specified performance or capability requirements regarding [sic] and will be advantageous to the Government during contract performance." *Id.* But this is simply a recitation of IFAS's performance on one of the predecessor contracts, not how IFAS exceeds the RFQ's requirements.

The same is true of the other strength IFAS claims regarding the RFQ's requirement to "[p]rovide financial support and analysis for the full cost recovery of the DWCF Revenue Support Team." *Id.* (alteration in original) (quoting ECF No. 25-5 at AR1376). [ . . . ]. *Id.* (quoting ECF No. 25-5 at AR1329). Again, IFAS is relying solely on its performance of one of the predecessor contracts to claim this strength.

But DISA may not award IFAS strengths due to its incumbent status because the RFQ does not disclose any advantage related to incumbency. *E.g.*, *Sys. Studies & Simulation, Inc. v. United States*, 152 Fed. Cl. 74, 88 (2020), *aff'd* 22 F.4th 994 (Fed. Cir. 2021); *United Concordia Cos., Inc. v. United States*, 99 Fed. Cl. 34, 45 (2011) ("We will not upset the agency's rating simply because plaintiff was the incumbent and believes its experience to be superior."). It is also unclear how IFAS's performance of the predecessor contracts exceeds the requirements of this procurement when IFAS itself argues (regarding its past performance ratings) that the predecessor contracts combined equate to essentially the same scope as this contract.

**B.     IFAS's challenges to enGenius's ratings**

> 1.     Past performance

>> a)     *Relevance*

IFAS challenges DISA's evaluation of all enGenius's past performance references as Somewhat Relevant. ECF No. 28-1 at 23-24. According to IFAS, enGenius's three prior contracts "were not of the same nature or scope as the Solicitation—they focused on different services such as IT training, certifications, customer service, messaging, presentations, data management and delivery services." *Id.* at 24. enGenius counters that the Agency "engaged in a

thorough review of ECG's three past performance references" and provided approximately 20 pages of analysis reviewing each aspect of the references before determining them to be Somewhat Relevant.  ECF No. 32 at 6.  Given the deference to the agency's past performance analysis in a FAR Subpart 8.4 procurement, enGenius contends IFAS falls short of proving any basis for relief.  DISA recognized which of enGenius's prior experience efforts correlated to PWS tasks and where its experience was not related.  IFAS's mere disagreement with DISA's evaluation is not a basis to find it arbitrary or capricious, particularly considering the "great deference" agencies get in performing past performance evaluations.  *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 785 (2011).

DISA determined that enGenius provided "scarce information" for PWS Task 6.1 in the first reference, but that enGenius "provided several requirements as related to PWS Task 6.2 Financial Analytical/Management Services and Budget Formulation/Execution."  ECF No. 25-3 at AR962.  Striking a balance between the "scarce information" on Task 6.1 and performing "several requirements" on Task 6.2, DISA determined that enGenius's first past performance reference "involve[d] some of the scope and complexities this solicitation requires" and rated it "Somewhat Relevant."  *Id.* at AR961-62.  As for the second reference, the Agency specifically identified the tasks that enGenius performed and how these tasks correlated to the tasks in the PWS.  *Id.* at AR962.  However, the Agency also noted that the cost of the second reference was "less than the requirement as outlined within the RFQ" (i.e., was less than the $4-6 million range in the RFQ).  *Id.* at AR811, 962.  Citing these findings, the Agency concluded that enGenius's performance on the second reference was "Somewhat Relevant" to the PWS because enGenius's performance "involved some of the scope of the effort and some complexities" the PWS required.  *Id.* at AR811.

IFAS offers little to challenge DISA's evaluation other than its own disagreement with it.  IFAS argues that enGenius's past performance efforts "[c]learly . . . were not of the same nature or scope as the Solicitation – they focused on different services such as IT training, certifications, customer service, messaging, presentations, data management and delivery services."  ECF No. 28-1 at 24.  But DISA recognized this.  *Id.* at AR962-63.  IFAS also contends that when enGenius's past performance references are "reviewed critically, it is clear that these submittals simply did not contain the financial program management and cost estimation tasks that were critical to the Solicitation."  ECF No. 28-1 at 24.  According to IFAS, such past performance should have been rated as Not Relevant.  *Id.*  But this ignores that the RFQ defines Somewhat Relevant as reflecting "some" of the scope—precisely what DISA found here.  ECF No. 25-1 at AR187.  There is no basis for IFAS's argument that past performance references must correspond to what IFAS contends are "core" RFQ tasks.

IFAS also argues that enGenius's third reference was improperly considered because it was for work performed by a subcontractor, Koniag.[7]  *Id.* at 28.  Under the RFQ, a quoter could only include subcontractor past performance if the subcontractor was to perform at least 20% of the work on this contract.  ECF No. 25-1 at AR111.  As the Government and enGenius point out, enGenius was permitted to provide a past performance reference for Koniag because it "provides

---

[7] IFAS raised this argument in its MJAR but made no further reference to it.  Because it is unclear whether IFAS meant to waive it, the Court addresses it.

20% or more of the support required."  ECF No. 33 at 21 (quoting ECF No. 25-1 at AR111); ECF 32 at 8.  In its proposal, enGenius states that Koniag would be performing just over 30% of the work over the base period and all option periods.  ECF No. 25-2 at AR615.  It was proper for DISA to consider Koniag's past performance reference.

       *b)      Confidence rating.*

IFAS argues that the Agency deviated from the RFQ criteria in its past performance evaluation by rating enGenius and others with Neutral Confidence.  ECF No. 28-1 at 25-28. IFAS first argues that the Agency improperly "flattened out" the past performance rating and converted the procurement into one for the lowest priced, technically acceptable ("LPTA") proposal.  According to IFAS, this is clear because "all quoters with a rating other than 'relevant' received an overall past performance rating of 'Neutral Confidence'; all quoters with a rating of 'relevant' received an overall past performance rating of 'Satisfactory Confidence.'"  *Id.* at 25.  And this purportedly harmed IFAS because it neutered its "incumbent advantage" and "eliminat[ed] the disparity in true past performance experience between IFAS and all other quoters."  *Id.*  As explained above, however, the RFQ gives no indication that it would grant extra past performance credit for incumbency, meaning there was no "incumbent advantage" to begin with.

The RFQ provides that "Neutral Confidence" rating means "[n]o recent/relevant performance record is available or the Schedule Contractor's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned."  ECF No. 25-1 at AR188.  The RFQ also states:

> Schedule contractors for whom information on past performance is not available or so sparse that no confidence assessment rating can be reasonably assigned will not be evaluated favorably or unfavorably on past performance and as a result will receive a "Neutral Confidence" rating for the Past Performance Factor.

ECF No. 31 at AR291.  IFAS believes this language covers two situations, neither of which apply: "(1) the contractor either does not provide any past performance references or the references do not respond to PPQs, so the agency has no information, and (2) the contractor simply has no available information to provide the 3 required past performance references." ECF No. 28-1 at 25-26.

DISA determined there was "scarce" information for one task in enGenius's first reference, ECF No. 25-3 at AR803, and for one task in its third reference, *id.* at AR816.  And the Agency specified which information was missing from both references.  In fact, DISA recognized that the first reference enGenius provided was within the magnitude range in the RFQ ($4-6 million) but because of the scarcity of information the Agency could only rate it "Somewhat Relevant."  *Id.* at AR803-04.  Given the significant deference to the Agency, the Court does not find it arbitrary and capricious for DISA to have concluded that although there was some relevant performance information, there was not enough to allow a "meaningful confidence assessment rating" to be assigned to enGenius's past performance references.  ECF No. 25-3 at AR964.

The same past performance criteria recently came before Judge Lettow in *Gritter Francona, Inc. v. United States*, 158 Fed. Cl. 597 (2022), and his analysis is persuasive here.  In *Gritter*, the solicitation defined "Neutral Confidence" as "no recent/relevant performance record [was] available or the offeror's performance record [was] so sparse that no meaningful confidence assessment rating c[ould] be reasonably assigned.  The offeror may not be evaluated favorably or unfavorably on the factor of past performance."  *Id.* at 602 (alterations in original).  Here, the RFQ includes the same definition.  ECF No. 25-1 at AR188.  In *Gritter*, like here, "[a] neutral confidence rating contemplated a finding that an offeror had too 'sparse' of a history to make a confidence determination whereas a limited confidence rating was to be given when there was a 'low expectation' of successful performance."  *Gritter Francona*, 158 Fed. Cl. at 608.

Like IFAS, Gritter Francona argued that the awardee's limited but somewhat relevant and highly rated past performance must be rated lower than Neutral Confidence.  *Id.*  Judge Lettow rejected this argument because it "would require placing double emphasis on relevancy and experience while downgrading the importance of quality."  *Id.* at 608-09.  Judge Lettow ultimately concluded that "[i]t would misapply the text of the solicitation to require an offeror with somewhat relevant and positive ratings to receive a lower confidence rating . . . while an offeror with no relevant or recent efforts would receive a higher rating and remain in the competition."  *Id.* at 609 (emphasis omitted).  While it is true that the agency in *Gritter* responded to a question that it would use neutral confidence as a sort of catch-all provision, that was clearly not necessary to Judge Lettow's analysis.  And the GAO reached the same conclusion in this case without reliance on any responses during the Q&A.  ECF No. 25-6 at AR2460.  In fact, the GAO "ha[s] repeatedly concluded" that somewhat relevant and positive past performance should receive no less than a neutral confidence rating to avoid penalizing those with limited experience.  *Id.*  Therefore, it was not arbitrary or capricious for DISA to rate enGenius or the other quoters with less than relevant, positive past performance ratings as having Neutral Confidence.

### 2.   Technical management rating

IFAS also argues that DISA deviated from the evaluation scheme by downplaying the two weaknesses it found in enGenius's management approach.  ECF No 28-1 at 29.  The first weakness was for "not adequately describing the relationship between the corporate administration and onsite administration."  ECF No. 31 at AR280; ECF No. 25-3 at AR953.  The second weakness was for "not explicitly stating that it will use its Place or Performance Management approach in the case of a contingency environment or while its employees are working from home."  ECF No. 31 at AR280; ECF No. 25-3 at AR953.  DISA explained that despite these weaknesses, enGenius's quote "meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate."  ECF No. 31 at AR280; ECF No. 25-3 at AR953.  IFAS claims these two weaknesses should have prevented enGenius from receiving an "'Acceptable' management rating pursuant to the RFQ."  ECF No. 28-1 at 30.

This court does not "second guess" an agency's technical ratings that "involve discretionary determinations of procurement officials."  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *see also Aero Corp., S.A. v. United States*, 38 Fed. Cl. 739, 763 (1997) ("Decisions as to the adequacy of the information presented in a proposal are . . . rightfully left to

the discretion of evaluators, especially where . . . the decisions are technical in nature."). The issue for the Court is whether DISA was arbitrary and capricious when it considered these weaknesses in evaluating enGenius's proposal.

The technical evaluation team assessed the weaknesses because enGenius's proposal was "unclear" on the two requirements, and it was "uncertain" how enGenius's would meet them. ECF No. 25-3 at AR927-28. While these uncertainties may "increase[] the risk of unsuccessful contract performance," *id.*, the question for the Court is whether DISA rationally considered them in making the award decision. The contracting officer clearly considered them, compared them to another quoter's similar weaknesses, and determined that enGenius's "approach had a no worse than moderate risk of unsuccessful performance . . . ." *Id.* at AR971. Given that these weaknesses were the result of uncertainty rather than inadequacies, the Court cannot find DISA's consideration of them arbitrary and capricious.

### C.    Best Value Tradeoff Analysis

Following its challenges to its and enGenius's evaluations, IFAS turns to the Agency's best value determination. ECF No. 28-1 at 31-32. IFAS contends that before the GAO the Government offered only one paragraph to justify the best value tradeoff analysis, which IFAS characterizes as "superficial and insufficient.". *Id.* at 31. The Government responds that IFAS's argument relies on cases that address FAR Part 15 procurements, not a FAR Subpart 8.4 procurement like this one. ECF No. 33 at 23. And because the amount of documentation in a FAR Subpart 8.4 procurement is less than that in a FAR Part 15 procurement, the Agency's justification is sufficient. *Id.* at 23-25. Moreover, the Government argues the paragraph excerpted by IFAS was merely a "concluding summary" and a "rational reader" would have understood the preceding 19 pages to be documenting the Agency's best value tradeoff analysis. *Id.* at 25-26. The Court considers the entirety of the tradeoff analysis in the price negotiation memorandum regardless of what the Government argued to GAO, because the document speaks for itself.

Here too, IFAS argues that DISA deviated from the RFQ's best-value evaluation scheme because DISA "clearly used an LPTA evaluation scheme for its tradeoff analysis between IFAS" and enGenius. ECF No. 28-1 at 35. According to IFAS, the Agency "decided IFAS and the awardee both met the technical requirements and then made the award decision based on the lowest price." *Id.* This argument is easily dispatched because, as explained above, DISA did not conduct an LPTA evaluation.

IFAS also faults the Agency for not accounting for the "risk" in enGenius's management weaknesses, and for not analyzing any risk in moving from "a successful incumbent offeror [i.e., IFAS] to one without any 'relevant' past performance.'" *Id.* IFAS's final argument alleges the culmination of these failures renders the entire best-value tradeoff analysis invalid because "a tradeoff analysis based on significantly flawed evaluation ratings is itself irrational." *Id.* at 36 (citing *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 695 (2012)). Again, the Court has already considered and denied each of IFAS's challenges to DISA's technical and past performance evaluations. Thus, there were no flawed evaluation ratings, much less "significantly flawed evaluation ratings."

And there is an insurmountable obstacle to IFAS's arguments—much of IFAS's arguments rely on cases applying FAR Part 15. But this was a FAR Subpart 8.4 procurement, not a FAR Part 15 procurement. And the requirements for a best value tradeoff under FAR Subpart 8.4 are significantly less than those for FAR Part 15. Under FAR Subpart 8.4, "the high standards for a proper tradeoff analysis under FAR Part 15 discussed by plaintiff . . . do not apply." *Distrib. Sols., Inc.*, 106 Fed. Cl. at 24; *see also 22nd Century Techs., Inc. v. United States*, No. 21-1137, 2021 WL 3856038, at *10 (Fed. Cl. July 21, 2021) ("Plaintiff fails to appreciate that this procurement is a FAR Subpart 8.4, not FAR Part 15, procurement for which the Agency is neither expected nor required to document every decision it makes in rigorous detail."); *Matt Martin Real Est. Mgmt.*, 96 Fed. Cl. at 116 ("The amount of documentation necessary in FAR Subpart 8.4 procurements does not rise to the level required by FAR Part 15.").

The Agency's price negotiation memorandum explains in detail the technical/management, past performance, and price factors for each of the quoters, including IFAS and enGenius. ECF No. 25-3 at AR949-75. Contrary to IFAS's repeated assertions, the contracting officer provided more than one paragraph of tradeoff analysis. It does not matter to the Court what representation IFAS insists the Government made to GAO that the analysis is only one paragraph, the record here speaks for itself. Again, the record here shows clearly that the contracting officer reviewed all the technical, price, and past performance evaluations before turning to her best value analysis. Over five pages, the contracting officer eliminated certain quoters due to ratings before comparing the three remaining quoters, enGenius, IFAS, and one other, against each other. *Id.* at AR969-73. The contracting officer then spent another 1.5 pages explaining her decision, and specifically that IFAS's rating was not worth the added cost. *Id.* at AR972-73. In the end, she concluded that IFAS's higher rated proposal was "not worth an additional $3,618,507.28 (11.1%) over the lifecycle of the program." *Id.* at AR973.

DISA's best value decision was reasonable and supported by the record, with the choice to not pay IFAS's price premium well within the contracting officer's discretion. While the Court does not opine on whether this analysis would survive a protest if this were a FAR Part 15 procurement, but it clearly survives under FAR Subpart 8.4. Therefore, the Court will not disturb it.

### D.    Good faith and fair dealing

Finally, IFAS argues that DISA breached an implied covenant to fairly and honestly consider its proposal. ECF No. 28-1 at 36-37. According to IFAS, DISA breached the implied duty of good faith and fair dealing based on the same conduct that it alleged violated the RFQ. *See id.* at 37. Although the Parties muddy the waters to a degree, the resolution of this argument is straightforward.

Recently, the Federal Circuit held that this Court has jurisdiction to hear an implied contract claim in a bid protest under 28 U.S.C. § 1491(b), and only § 1491(b). *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1342 (Fed. Cir. 2021). The Circuit also made clear that the arbitrary and capricious standard applies to these implied contract claims like IFAS makes here. *Id*. Because the Court already determined that DISA's evaluation and award

decisions were all rational, IFAS cannot prevail here for the same reasons it did not prevail above—none of the alleged conduct was arbitrary and capricious.

Yet IFAS points to two post-*Safeguard* cases that it claims support the opposite view: that a plaintiff may allege, independent of its other claims, a breach of the duty of good faith and fair dealing.  ECF No. 34 at 24.  IFAS relies on *Thalle Constr. Co., Inc. v. United States*, 159 Fed. Cl. 698, 707 (2022), and claims the Court evaluated "whether an offeror was treated fairly and impartially per FAR 1.102-2 – a basis for two of IFAS's claims, including the breach of the duty of good faith and fair dealing."  ECF No. 34 at 25.  IFAS also relies on *Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 113 (2021), to argue that *Safeguard Base Operations* did not foreclose an independent claim for breach of good faith and fair dealing.  ECF No. 34 at 24.

*Thalle* concerned a claim of unequal treatment under FAR 1.102-2.  *See Thalle Constr. Co., Inc. v. United States*, 159 Fed. Cl. 698, 707 (2022) ("A claim of unequal treatment is derived from the FAR requirement that '[a]ll contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same.'").  But the Court's finding that DISA adhered to the RFQ throughout its evaluation and award precludes such a claim here.

IFAS's reliance on *Blue Origin* is similarly misplaced (as is the Government's disagreement with it).  While IFAS relies on *Blue Origin* to argue that the implied duty claim survives *Safeguard Base Operations*, the Government argues that *Blue Origin* is wrong in finding such an implied duty survives *Safeguard Base Operations*.  On its face, however, it appears quite clear that *Blue Origin*'s holding does exactly what the Government asks the Court to do here—reject the implied duty claim because the Court found nothing arbitrary and capricious in any of the agency's evaluations or award decision.  *Blue Origin*, 157 Fed. Cl. at 113.

In *Blue Origin*, the court understood the Federal Circuit's holding in *Safeguard Base Operations* to mean that a breach of implied-in-fact contract, in the procurement context, falls within the bid-protest jurisdiction of this court under 28 U.S.C. § 1491(b)(1).  *Id*.  And *Blue Origin* also recognized that Safeguard requires this Court to review such implied claims under the same APA review as other bid protest claims under § 1491(b)(1).  *Id*.  The Court rejected Blue Origin's claim, which like IFAS's, alleged the same conduct underlying its prior counts also amounted to a breach of the implied duty.  According to Blue Origin, "the Court has found no portion of [the agency's] evaluation to have been arbitrary and capricious; the sum of Blue Origin's claims does *not* yield more than the sum of its parts."  *Id*. (emphasis in original); see also *SAGAM Securite Senegal v. United States*, 154 Fed. Cl. 653, 662 n.3 (2021), *appeal docketed*, No. 21-2279 (Fed. Cir. Sept. 21, 2021).  The same applies here.  Having found none of DISA's conduct arbitrary and capricious, its implied contract claim on those same issues must fail.

The only thing that is new in IFAS's implied contract claim is an assertion that DISA acted with "a specific intent to injure IFAS."  ECF No. 28-1 at 37.  To prevail on such a claim, IFAS must come forward with clear and convincing evidence that DISA intended to cause IFAS specific injury.  *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1288 (Fed. Cir. 2010) (quoting *Galen Med. Assocs., Inc v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("In the cases where the court has considered allegations of [governmental] bad faith, the

necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff.")).  IFAS has not alleged, much less come forward with clear and convincing evidence, any conduct that could overcome the presumption of good faith by the Government.

## IV.    Injunctive Relief

When determining whether to issue a permanent injunction, a court considers: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors granting relief; and (4) whether granting injunctive relief is in the public interest.  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)).  As explained above, IFAS has not succeeded on the merits.  Because IFAS has not succeeded on the merits, a necessary factor to receive permanent injunctive relief, the Court denies IFAS's motion for a permanent injunction.  This is because "[a]bsent success on the merits, the other factors are irrelevant." *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003).

## V.    Motion to Strike

The Government included in its cross-MJAR a declaration from the contracting officer regarding potential harms from injunctive relief.  ECF No. 33 at 31; *see also* ECF No. 33-1. IFAS moved to strike the declaration claiming it is "improper protest evidence" and arguing the contents of the declaration were "speculative, improper, and prejudicial" to IFAS.  ECF No. 34 at 28.  Because the Court denies IFAS's motion for injunctive relief without reference to the declaration, the Court denies the motion to strike as moot.

## VI.    Conclusion

For the reasons stated above, the Court hereby:

1. Denies IFAS's motion for judgment on the administrative record, ECF No. 28;

2. Grants the United States' cross-motion for judgment on the administrative record, ECF No. 33;

3. Grants enGenius's cross-motion for judgment on the administrative record, ECF No. 32;

4. Denies IFAS's motion to strike the declaration of the contracting officer as moot, ECF No. 34; and

5. Directs the Clerk's Office to enter judgment in favor of the United States and enGenius Consulting Group, Inc.

IT IS SO ORDERED.

<u>s/ Edward H. Meyers</u>
Edward H. Meyers
Judge